JOSEPH SHELDON, ADMINISTRATOR, AND ANOTHER, *vs.* STEPHEN
P. BRADLEY AND OTHERS.

A conveyance was made by a deed absolute on its face, but which was intended
in part to secure a debt, and in part to defraud creditors, the property much
exceeding in value the amount of the debt. After the death of the grantor
his administrator brought a bill in equity against the grantee to set aside the
conveyance as fraudulent, but the court found that the deed was a valid deed
and vested absolutely in the grantee all the title of the grantor, and dismissed
the bill. Immediately after this the grantee conveyed the premises for a valu-
able consideration to other parties. Upon a bill in equity afterwards brought by
the administrator against the first grantee for an account of the money received
by him from the sale of the property, it was held—1. That the conveyance
though in form absolute was an equitable mortgage. 2. That the decree was
to be regarded as conclusive only as to the fraudulent character of the deed
and did not estop the administrator from claiming that the deed was a mort-
gage. 3. That the money received by the grantee above the amount of the
mortgage debt was money had and received by him for the use of the estate
of the grantor, and that he was liable to account for the same. 4. That the
title acquired by the purchasers from the grantee was to be regarded as a per-
fect title, and the only remedy of the administrator was against the proceeds in
the hands of the grantee.

It was not averred in the bill that the money was needed for the payment of debts,
but that fact was found by a committee in the court below. Held that the
court below should be advised that the bill be amended so as to aver that fact
before the passage of the decree.

The widow of the grantor, who had been one of his administrators and was
afterwards removed, was one of the petitioners. It appeared that as adminis-
trator she had for a long time, with full knowledge of the facts, refused to
assert the rights of the estate with regard to the property, though requested to
do so by a creditor with an offer of indemnity against costs, and that she had
done this under a private arrangement with the grantee for the conveyance of
the premises to her on payment of the mortgage debt to him. Held that she
had no just claim for the interference of a court of equity in her favor with
regard to her right of dower in the property, and that the bill should be dis-
missed as to her without prejudice to any rights which she might be able to
establish at law.

BILL IN EQUITY to set aside a decree, and for an account
and an injunction; brought to the Superior Court in New
Haven county. The petitioners were Joseph Sheldon, admin-
istrator of the estate of William F. Bradley, and Maria L.
Bradley, widow of the intestate; the respondents were Ste-
phen P. Bradley, James Baldwin, Clark R. Shelton, and

Elizabeth B. Shelton, his wife. The following facts were found by a committee to whom the case was referred:

On the 10th of June, 1861, William F. Bradley was the owner of a piece of land, the subject of the controversy in the case, situated in the town of Orange, in New Haven County, containing about three acres, with buildings thereon, subject to a mortgage to the New Haven Savings Bank of $1,500. He was at this time in embarrassed circumstances, unable to pay all his debts. Among others he was owing the respondent Stephen P. Bradley, who was his nephew, the sum of one thousand dollars. The premises were worth considerably more than the mortgage debt to the savings bank and the amount of debt due Stephen; and with the intent to secure the latter indebtedness, and at the same time protect the property from being taken by his other creditors, of which intent Stephen was aware, William conveyed the premises to Stephen on the 10th of June, 1861, by a quit-claim deed of that date. This deed was absolute on its face, but it was understood between them that William was to have the premises back on the payment of the $1,000 and interest. This deed was recorded on the day of its execution, June 10th, 1861, and at first no other writing was contemplated; but a few days after, at the suggestion of some of William's family, William got Stephen to execute with him an agreement dated June 12th, 1867, by which Stephen agreed to sell and convey the land to him, upon the payment of $1,000 with interest in certain agreed installments within three years. The thousand dollars mentioned in this contract was the old debt due from William, and the real understanding between them, that the property was William's, subject only to the payment of the debt, remained unchanged. William continued in the possession of the premises until his death, which occurred January 28th, 1864, treating them as his own, paying the taxes on the same and the interest to the savings bank and the interest on the $1,000, and spending money to some extent in the improvement of the premises. After William's death his widow, the petitioner Maria L. Bradley, and the other petitioner Joseph Sheldon, were appointed administrators on

his estate by the court of probate for the district of New Haven, wherein the estate is still in course of settlement. This administration was taken out April 7th, 1864. After William's death the taxes were paid by Stephen, to whom the widow referred the collector when he called upon her for the same. Stephen also thereafter paid the interest to the savings bank on its debt. The widow, however, paid Stephen the interest on the $1,000 debt after her husband's death to the amount of $60.12, with effects (principally corn) belonging to William's estate. The widow also continued to occupy the premises, letting part of the house to tenants, until April, 1867. The widow was aware of the conveyance by William to Stephen, and of their understanding about the premises, and how Stephen held the title, and also knew of the written agreement of June 12th, 1861, and that her husband had it, and she was reminded of the existence of this contract the spring after her husband's death by Jacob Thompson, one of her husband's creditors, to whom her husband had communicated the fact that there was such a document.

The petitioner Sheldon drew the quit-claim from William to Stephen, and was one of the witnesses thereto, and took the acknowledgment thereof, but was not present at its delivery. He also drew the document of June 12th, 1861, but was not present at its execution. The petitioners as administrators returned their inventory of William's estate to the court of probate July 8th, 1864, making no mention of these premises or any interest therein. The estate they returned was all personal. William's estate was insolvent, and commissioners were appointed thereon, who made their report of the claims against the estate to the court of probate in April, 1865. Among the claims allowed was one in favor of one Charles A. Dorman, to the amount of over a thousand dollars. This claim was in charge of Charles T. Shelton, an attorney, to prosecute. Shelton had heard from William soon after the conveyance to Stephen, that he was entitled to have a reconveyance of the premises in question on the payment of the savings bank debt and a thousand dollars to Stephen. He told the administrators of this, and urged them to inven-

tory the premises, and institute proceedings against Stephen to obtain the property and William's interest therein for the benefit of his creditors. This was declined by both, and was also declined when Shelton offered, as he did, an indemnity against the cost and expense of the proceeding—the administrator Sheldon telling him that the papers between William and Stephen were drawn in his, Sheldon's, office, and that there was no chance to get anything for William's estate. At Shelton's instance, however, Sheldon added to the inventory of William's estate an interest in these premises, but caused it to be appraised at only one dollar, claiming it to be worthless. Soon after, the administrators, having obtained an order from the court of probate for the purpose, advertised to sell the interest of William's estate in these premises at public auction on the 1st of January, 1866. Shelton, in behalf of the Dorman claim against the estate, thinking that while the title stood as it did an inadequate amount would be realized from William's estate, applied for an injunction against the sale to the Superior Court for New Haven County, on the ground that it would fail to realize much under the circumstances, and alleging the deed of William to Stephen to be fraudulent against William's creditors. Stephen and these administrators were made parties to this petition, and a temporary injunction was granted against sales by the respondents, which were thereby stopped. A motion was made to dissolve this injunction, which motion was heard in October, 1866, by Judge Pardee of the Superior Court. Both these administrators were witnesses on this hearing. At the instance of the judge no order was made by him, but it was agreed by the counsel on both sides that a petition should be brought in the name of the administrator, Sheldon, at the next term of the court in that county, against Stephen, to test the validity of his deed from William. Stephen's counsel said that this would only make delay, but the judge said the case should be a privileged one, to be heard and disposed of at once, and so it was agreed it should be, Sheldon however insisting, and so it was settled, that all the expenses and risk of the suit should be assumed by Shelton or his clients,

and were not to be Sheldon's or belong to William's estate, as he claimed nothing could be made for the estate by the litigation. On the last day for service of suit at the next term Stephen's counsel applied to Sheldon, and told him the agreement had not been kept, and no suit had been brought. Sheldon replied that he would see Shelton, and reported to Stephen's counsel that he could not find him, or something of the sort. The case was not brought, and Stephen's counsel brought the matter before the court, and demanded a trial on the Dorman case, and the petitioners not being ready the court non-suited them, and the case went out January 10th, 1867. At the instance however of Shelton, it was agreed by Stephen's counsel that the latter should not sell, on condition that a petition to test Stephen's title should be brought and disposed of at the approaching March term of the Superior Court. When the time of service was nearly out Stephen's counsel again complained, and threatened to sell at once, and thereupon the case was brought, and a sale enjoined. At the March term Shelton reported to Stephen's counsel that the whole matter would be arranged so that William's estate would get something out of it, and upon this assurance it was agreed by Stephen's counsel that the case might go to the following May term with the understanding that it should then be disposed of either by settlement or trial. When the May term arrived, however, the matter was still unarranged, and there were but five days in the term. Sheldon knew of the arrangements and how the case stood. Shortly before the May term he had decided to make a business visit to Europe, but this does not appear to have been known at first to others. On Friday, May 17th, 1867, the 4th day of the May term, the counsel of Stephen, who had been absent for a day or two, looked up Sheldon, mentioned his having heard of his departure for Europe, and expressed his surprise, and insisted that the case should be disposed of at that term and not go over again. Sheldon replied that he had tried to arrange it and had not been able to do so, had tried to get something for William's estate, and either then or previously mentioned a thousand dollars as the sum he hoped to get. Finally

he sent Stephen's counsel to Shelton, saying that he, as administrator, would have nothing more to do with the matter. Stephen's counsel replied that he should go to the court with it. This interview was in the evening, and that night Sheldon left for Europe. · The next day Stephen's counsel went to Shelton and notified him that the case must be disposed of, and that he should call the attention of the court to it and have it set down for trial.

On Monday, May 20th, 1867, the fifth and last day of the May term, Stephen's counsel again saw Shelton, who wished to arrange some terms of settlement. This was declined, and a decree or a trial insisted on, with the remark that after a decree there could be negotiations. Stephen's counsel went to the court, Shelton being present, and stated the various agreements about the proceedings, and the court was about to order a trial either for that or another day, whereupon Shelton agreed to a decree.

The answer of Stephen Bradley to the petition was filed, and the decree complained of in the present suit was passed by the court, on the 20th day of May, 1867, without further or other hearing. The dower of William's widow, if any existed, was not supposed to be extinguished by the decree, nor was that any purpose of the proceedings in the case. She was not a party to them; but Clark R. Shelton, one of the respondents, both before and after the decree, (and before the decree with the aid and concurrence of Sheldon,) endeavored in vain to induce her to release any claim of that sort which she might have, by the offer of a small sum of money, entirely inadequate if the claim were real.

· On the same day on which the decree was passed, in the afternoon, C. T. Shelton, Clark R. Shelton, Stephen P. Bradley, James J. Baldwin, one of the respondents, and Marcus E. Baldwin, (James, the father-in-law, and Marcus, the brother-in-law of Stephen), met at the office of Mr. Doolittle, Stephen's counsel, and then and there Stephen P. Bradley conveyed, by deed of quit-claim of that date, the premises in question to Marcus E. Baldwin, receiving at the time $500 from Clark R. Shelton, furnished by James Baldwin, who

further undertook for Clark R. Shelton to pay Stephen $2,500 more, which he afterwards did pay, and for which Clark R. Shelton was to give, and afterwards did give, security on the premises.    Clark R. Shelton was further to pay to Marcus E. Baldwin for the administrator, or to the administrator on William's estate, and for the benefit of the estate, a further sum of $1,000, within four months from the 20th of May, 1867, this being about the time it was supposed the administrator would be gone.    This sum also James Baldwin agreed to furnish, if necessary, on the same security as for the other amount.    These sums of $500, $2,500, and $1,000, with the debt due the savings bank of $1,500, made up the $5,500, which Clark R. Shelton undertook to pay for the premises. Marcus on his part executed and delivered to Clark R. Shelton the following agreement:

"New Haven, May 20th, 1867.    Whereas Stephen P. Bradley has this day conveyed to me the Wm. F. Bradley place in West Haven, being the same premises mortgaged to the New Haven Savings Bank to secure a note of fifteen hundred dollars :—Now therefore, in consideration of the premises and of one dollar to me paid by Elizabeth B. Shelton, wife of Clark R. Shelton, I agree that, having received of her this day $500, I will, upon the further payment of $2,500 and the interest thereon, within three months from this date, and also the further sum of $1,000 to be paid to me or to the administrator on the estate of William F. Bradley, within four months from this date, convey by quit-claim deed all the interest in said premises which the said Stephen P. Bradley acquired by deed from William F. Bradley, and also the interest which the said Stephen has vested in him by a decree of the Superior Court for New Haven County, now in session, and entered up this day, and will also covenant that the said Stephen P. and myself have not and will not during said three months convey the premises to any other person ; and the said Elizabeth is to occupy said premises till said three months elapse ; and it is understood and agreed that if the said Elizabeth shall fail to make said payments according to the said con-

tract, the sum of $100 shall be forfeited to the said Marcus E. Baldwin, and said Elizabeth shall have no claim on him therefor. MARCUS E. BALDWIN."

Clark R. and C. T. Shelton were both at this time insolvent; James J. Baldwin was responsible, and a man of large means. Stephen P. Bradley wished to secure the $3,000, which he had finally agreed to take for his conveyance of the premises, and to put the title out of himself to avoid further litigation ; but Clark R. Shelton could not raise the funds immediately to pay the $2,500 and $1,000, in ad lition to the $500 paid down, and therefore Marcus undertook to hold the title until arrangements could be made to carry out what further Clark was to do. Clark could not hold the title in his own name on account of his creditors, and so it was arranged to be given to his wife. Accordingly on the 9th day of July, 1867, by a quit-claim deed dated the 6th of the same month, Marcus conveyed the premises to Elizabeth B. Shelton, Clark's wife, and Clark and his wife immediately by deed, dated July 9th, 1867, mortgaged all the premises, except a portion on the west side, to James· J. Baldwin, to secure the sum of $3,000, which he had previously furnished for the payment to Stephen, and the further sum of $1,000 which he had then furnished or was to furnish, to be paid to the administrator on William's estate. Of this last sum $500 was actually paid to C. T. Shelton for the administrator before the latter's return from Europe, and the rest has been ready to be paid to him on notice that he would receive it.

This mortgage debt to James J. Baldwin was in two notes of even date with the mortgage deed, both payable to James J. Baldwin or order, with interest from date, one for $2,500 on demand, and the other for $1,000 sixty days from date. Joseph Sheldon was informed early after his return in August, 1867, of the substance of the arrangement which had been made, and did not then dissent ; but afterwards he did dissent, and has never received any part of the $1,000 which by the arrangement was to be paid to William's estate.

Immediately after the deed given by Stephen Bradley to Marcus Baldwin, Clark R. Shelton went into possession of the

premises.    Before he took the deed to his wife, in July, 1867,
he had bargained to sell 108 feet front of the premises for
$20 a foot, and another 100 feet for $15 a foot.    These bar-
gains he afterwards carried out, thus disposing of 218 feet
front by 194 feet rear, from the west side of the premises.
The rest, including the dwelling house, still continues in the
name of Elizabeth B. Shelton, subject to the mortgage to
James Baldwin.    Clark R. Shelton has made large outlays in
improvements on the part retained, which he estimates at
$4,200, but he kept no account of the same, and no sufficient
means were furnished to the committee to ascertain the
amount.    He undoubtedly obtained these premises much
below what has turned out to be their value, under certain
public improvements contemplated at the time of his purchase,
and either then going on or shortly after carried into effect,
and also considerably below what the premises would have
sold for in open market in the absence of the dispute as to
the title.    This title he supposed he had received by the
action of the court, and by the conveyance of Stephen, on the
20th of May, 1867, and otherwise he would not have purchased.

The written contract above mentioned, of June 12th, 1861,
between William and Stephen Bradley, was known to Maria
L. Bradley, and Joseph Sheldon had reason to suppose such
a writing existed, and had reasonable diligence been exer-
cised it would have been found at any time after William's
death by these administrators.    When found it was in Wil-
liam's secretary, where he kept his papers, which ever since
his death had been in the family and in the custody of his
widow.    These papers were looked over early after William's
death by Joseph Sheldon, in company with the widow and
her daughter, Jane E. Clark, named in the petition, and was
not then noticed.

The petitioners claimed that it was found some time in
May, 1867, which was the time when the decree complained
of was passed.    It was put on record in Orange, in the fol-
lowing October.    About the 1st of April, 1867, Maria L.
Bradley vacated the premises, and gave them up to Stephen
P. Bradley, on his suggestion that the possession by him

would aid him in litigation then pending respecting the same. She knew he was claiming title to the premises against her husband's estate, and she as well as Joseph Sheldon had declined as administrators to proceed against Stephen for the same, when requested so to do in 1865 by C. T. Shelton; and down to the actual sale to Clark R. Shelton she was hoping that Stephen would convey the premises to her on the payment of his original debt of $1,000 and interest. He had promised her he would do so, and had told her that he would not sell to any one but herself or the administrator, and that all he wanted was his debt. C. T. Shelton resisted the motion to set aside the injunction in the Dorman case, and instituted and carried on the proceedings then in good faith, and had therein no encouragement, but discouragement, from the present petitioners. They were both present and witnesses in that case at the hearing. After that hearing C. T. Shelton entered into negotiations with Stephen P. Bradley, through James J. Baldwin, to effect a compromise if he could, and secure something for William's estate. This negotiation hung along through the winter of 1866 and 1867. It finally resulted in an understanding, sanctioned by Joseph Sheldon, if the creditors of William's estate would agree, that the property be sold at $6,000, of which the savings bank mortgage would take $1,500, Stephen should have $3,250, and William's estate $1,250. It was, with the knowledge of Joseph Sheldon, proposed by C. T. Shelton to his brother Clark, that the latter should buy the property at the above price of $6,000, and about the 1st of April, 1867, Clark agreed to do it if a good title could be got, and thereupon Joseph Sheldon and Clark Shelton made various unsuccessful efforts to obtain the consent of a majority of the creditors of William's estate to such sale, and to get the widow for a small sum to release her dower, which was claimed to have been set out to her under action of the court of probate in an undivided third of the premises. After Sheldon had gone abroad, Clark Shelton refused to give over $5,500 for the premises, giving as a reason the delay which had intervened, and in the arrangement adopted Stephen Bradley threw off

$250 of what he had required, and $250 was dropped for William's estate of what Clark had originally agreed to pay to it.

It was the negotiation of this compromise and the endeavor to secure the consent of the creditors, which caused the delay in bringing the proceedings in the name of Sheldon, as administrator, proposed at the hearing in the Dorman case.

Neither of the respondents had anything to do with instituting the proceeding which resulted in the decree complained of, nor does it appear that either of them was concerned in getting the decree. It was obtained by the persistent urgency of the counsel of Stephen Bradley, without any understanding between him and C. T. Shelton on the subject, or, so far as appeared, between C. T. Shelton and either of the respondents.

C. T. Shelton had received from William F. Bradley in 1861 a just idea of the true state of matters between William and Stephen, but he did not know of the existence of the written contract between them of June 12th, 1861, which the petitioners by reasonable diligence might at any time after the death of William have procured and used in the course of the proceedings.

Stephen P. Bradley and James J. Baldwin knew that the former was getting what did not belong to him in this transaction, and Stephen's object in placing the title out of his hands so immediately after the decree was, if possible, to secure the price he obtained and be free from further litigation.

The consideration expressed in Stephen's deed to Marcus Baldwin was one dollar. Baldwin paid nothing in fact, and was merely a holder of the title in passing it to Clark R. Shelton's wife. The latter does not appear to have had anything to do with this matter personally, except the giving the mortgage and mortgage notes to James J. Baldwin, or to have known anything of the previous transactions, except the conveyance made to her on the day they executed the mortgage.

The importance of the facts known to the widow, Maria L.

Bradley, must have been apparent to her in the whole settlement of the estate, and reasonable diligence would have put Joseph Sheldon in possession of the facts; but they were not communicated by them to the respondents, or to C. T. Shelton. Maria L. Bradley was not a party in the case in which the decree is complained of. Her letter of administration had been revoked by the court of probate early in the year 1866, and since then Joseph Sheldon has been sole administrator.

When he bought Clark R. Shelton understood that he was getting the premises below their value, and although not aware of the actual state of the facts about Stephen's title, he knew there was a dispute about it between Stephen and William's creditors, and that some of the latter had refused to agree to a settlement for a larger amount to be paid by him for the benefit of William's estate than he actually did pay, and that the administrator had refused to sell on the terms offered without the consent of such creditors, and that he had gone to Europe before the decree was passed. If after the decree had passed he had inquired of Maria L. Bradley and told her how it was proposed to dispose of the premises without benefit to her, he could have obtained full information of how matters stood, and he had sufficient information to lead him to make the inquiries of her.

Neither C. T. Shelton nor either of the respondents had any reason to suppose that the decree complained of would have been interfered with by Joseph Sheldon had he been present and known of it, and Sheldon had no reasonable ground to suppose that the case would be postponed to another term. No objection was interposed, or could properly be so far as the Dorman claim against William F. Bradley's estate (which was represented by C. T. Shelton) is concerned, and it was in the interest of this claim that C. T. Shelton instituted and carried on the legal proceedings in the matter, although by the understanding, in the name of the administrator and for the benefit of William's estate. The result is, that of the premises which should have been applied towards liquidating the debts due from William F. Bradley's estate,

part has accrued to the benefit of Clark R. Shelton in a smaller price paid by him than the value thereof, and part to Stephen P. Bradley in a large excess received by him above what was due on his debt against the said William.

Upon these facts the case was reserved for the advice of this court.

*D. B. Beach*, for the petitioners.

*C. R. Ingersoll*, for the respondents.

SEYMOUR, J.   It appears that in June, 1861, the deceased, William F. Bradley, by a deed absolute on its face, conveyed the premises in controversy to Stephen P. Bradley.   The conveyance was made partly to protect the property from the grantor's creditors and partly to secure a debt of $1,000 due from the grantor to the grantee.   There was an incumbrance on the premises to a savings bank of $1,500, but the property considerably exceeded in value the incumbrances, being worth about $6,000.   In January, 1864, William F. Bradley died and the petitioners were appointed administrators on his estate, which was represented to be and actually was insolvent. The facts in regard to the conveyance now in dispute, its object and consideration, were fully known to the widow, and the means of knowledge were open to the other administrator, but they did not include the premises in the inventory until compelled to do so by a creditor of the deceased ; and until after the sale of the property by Stephen P. Bradley in 1867, the administrators seem to have made no efforts to secure it for the benefit of creditors.

And thus it has come to pass that, though the interest of William F. Bradley's estate in the premises appears obvious and indubitable, matters are now so complicated that this interest is in danger of being lost to the creditors.

If in the pending bill the administrator was seeking anything for his own individual benefit we might regard his rights as abandoned by the manner in which the administrators treated the interests committed to their keeping, but the

creditors of the estate have rights which can be prosecuted in no other way than in the name of the administrator, and we feel bound to protect these rights of creditors so far as we may be able to do it without doing injustice to others.

One of the principal difficulties in giving any relief to the petitioner arises from the decree of the Superior Court of May term, 1867. By that decree it is found " that said deed from William F. Bradley to the said Stephen P. Bradley was a valid and *bonâ fide* deed and for a valuable consideration, and vested absolutely in the said Stephen P. Bradley all the title in and to said premises which the said William F. Bradley had at the time of said conveyance."

Immediately upon the passing of this decree Stephen P. Bradley conveyed the property in fee to the wife of Clark R. Shelton, and she has since sold portions of the premises to third persons. At the time Stephen so sold and conveyed he had a clear title of record and had the decree of the Superior Court in his favor pronouncing his title good.

The grounds alleged in the petition for setting aside this decree and this conveyance by Stephen, are not found to be true, and we have come to the conclusion that we cannot disturb the title thus vested in the wife of Clark R. Shelton and her grantees. Nor do we feel at liberty to disturb and set aside the decree itself. But we do not construe the decree so as to make it a full answer to the pending petition.

The respondents claim that this decree conclusively settles the fact that the conveyance from William to Stephen was *bonâ fide* and absolute and without condition, and left no equity of redemption in William or in his representatives, and in terms the decree is broad enough to support this claim of the respondents ; but on examination of the proceedings upon which the decree was passed it appears that the petition in that case attacked the conveyance solely as being made in fraud of creditors. The petitioner in that case, Joseph Sheldon as administrator, was the same as one of the petitioners in the case now before us. Pending the petition he left for Europe. In his absence an answer is filed and decree passed by the consent, not of the petitioner, but of G. T. Shelton,

attorney for one Dorman, a creditor of William's estate, in whose behalf that petition had been in part prosecuted. Under these circumstances the most that Stephen could justly claim as against the petitioner was a decree negating the fraud charged in the petition. Neither the petition nor answer were conversant in any manner with the claim now made in the pending petition that the conveyance was in truth a mere mortgage to secure a debt of $1,000. We think the decree must be construed in connection with the bill and answer on which it was founded, and in connection with the circumstances under which it was passed, and, as between Stephen himself on the one hand and the estate of William on the other, we think it is going quite far enough if we give to Stephen the benefit of that decree so far as it relieves the conveyance to him from the charge of being in fraud of creditors. We cannot construe the decree as a bar to the present claim of the administrator, that the conveyance was a *bonâ fide* mortgage made to secure an honest debt and subject to redemption on payment of the debt. The decree cannot be construed to decide a matter which was not in issue before the court upon the pleadings and to which the attention of the court was not called.

So far then as Stephen P. Bradley is concerned we think the conveyance to him must be treated as a mortgage. The committee finds that it was so understood, and that at first no other writing than the deed was contemplated. In the case of *French* v. *Burns*, 35 Conn. R., 359, it was decided that a deed absolute on its face, if in fact taken as security for a debt, constitutes in equity a mortgage.

The document executed by Stephen P. and William F. Bradley two days after the date of the deed is in form a contract to sell and convey the premises on certain terms, but in substance and effect it is a defeasance and cannot operate to extinguish the right of redemption.

If therefore Stephen P. had not sold the property, the administrator of William would be entitled to redeem for the benefit of the creditors of the estate; but the property is now in the hands of purchasers whose title we think, as before

Sheldon *v.* Bradley.

stated, we ought not to disturb. We therefore advise the Superior Court to confirm the sale, and that Stephen P. Bradley be charged with the amount which he received on the sale with interest, deducting the amount due him on the debt to secure which the conveyance to him was made. The amount which he received for the property more than his debt belongs in equity to the estate of William. If a party who receives property as security for a debt sells the property to a *bonâ fide* purchaser, so that the property itself cannot be followed by the equitable owner of it, the proceeds of the sale are monies had and received for the use of the equitable owner, after payment of course of the debt to secure which the property was pledged. In this case the money could not be recovered at law, because at law the absolute deed could not be shown to be a mortgage. The case is therefore a proper one for equitable relief.

It appears from the report of the committee that $1,000 of the purchase money of the property sold by Stephen was by the terms of the arrangement to be paid to the administrator on William's estate. Of this sum $500 is in the hands of James J. Baldwin and $500 in the hands of C. T. Shelton, ready to be paid to the administrator. These sums should of course be paid to the administrator and received by him as so much of the proceeds of the sale.

In order to ascertain the amount due an account must be taken by the Superior Court. In taking the account Stephen will of course be charged with whatever rents and profits, if any, he has received while he has been in possession.

We notice that in the pending bill the petitioner does not allege that these funds are wanted for the payment of the debts of the deceased. There is only a general allegation that the estate is in progress of settlement as an insolvent estate. It appears from the committee's report that the estate is in fact insolvent and needs the proceeds of the property in dispute to pay creditors.

Our advice is founded on this consideration; for if the funds are not wanted to pay debts the right of redemption is in the heirs of the deceased and not in the administrator.

Sheldon *v*. Bradley.

Our advice is therefore conditional, that the bill be amended to show what the report of the committee finds to be true, that the amount is needed for creditors and to be applied for their benefit.

The widow joins with the administrator in this petition ; but it appears that, having a full knowledge of the interest which her husband's estate had in the premises, she, while acting as administrator, declined to vindicate the rights of the estate by proceedings against Stephen, though requested to do so by a creditor with an offer of indemnity against costs and expenses. Down to the sale of the premises by Stephen in 1867 she acted in direct opposition to the claim she now makes. Her motives may be inferred from the finding of the committee " that until the actual sale she was hoping that Stephen would convey the premises to her on payment of his original debt of $1,000, as he indeed had promised her he would do." Having thus trifled with the rights she now seeks to enforce, we think she has no just claim for the interference of a court of equity in her behalf. On the final settlement of her husband's estate in the court of probate she may possibly be able to establish a right to share in the amount recovered by the administrator in these proceedings, but we cannot in this bill adjust the relative rights of these parties with each other, and our advice is that the bill as to the widow be dismissed without prejudice to such rights as she may have at law.

In this opinion the other judges concurred.